IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TIFFINI E.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 20 C 223 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| ANDREW SAUL, Commissioner of Social Security, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act ("Act"), and Supplemental Security Income under Title XVI of the Act, 42 U.S.C. §§416(i), 423, 1381a, 1382c, just over four years ago. (Administrative Record (R.) 409-421). She claimed that he became disabled as of January 1, 2015, due to "psuedotumor cerebri." (R. 450). Over the next three years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on January 13, 2020. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on July 8, 2020. [Dkt. #15]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

**I.**

**A.**

Plaintiff was born on February 14, 1982, and so was about 33 at the time she claims she became unable to work. (R. 409). She has one year of college. (R. 451). Plaintiff has a solid work record from the time she was sixteen years old, from 1998 through 2013. (R.443). Her work experience has mostly been in retail, most recently as a cashier, but prior to that in customer service and as a supervisor. (R. 451).

As is generally the case in these proceedings, the medical record is immense – about 1400 pages – and, as is also generally the case, unorganized and largely irrelevant. (R. 555-1900). The Commissioner cites to just 15 pages of it – 1% – to support the ALJ's decision in his brief. [Dkt. #20, at 7, 10]. Plaintiff cites to only 60 pages. [Dkt. # 12, at 2-7]. As such, a long and tedious summary of the plaintiff's files will be dispensed with, and the medical record will be referenced only insofar as is necessary to address the parties' arguments. Suffice it to say that, at a relatively young age, plaintiff has become beset with some serious and rather uncommon medical issues.

Plaintiff suffers severe migraines, about three times a week. They can come with blurred vision and require her to lie down in a darkened room. (R. 188-89). She has a sizeable tumor, protruding from her skull, which is visible from her eyebrow back halfway around her head. (R. 84, 193). On February 19, 2015, a CT scan of plaintiff's brain revealed stable large osteoma of the calvarium and mucosal disease in the bilateral ethmoid air cells and maxillary sinuses. (R. 568). On March 9, 2015, Dr. Juan Alzate, a neurosurgeon, told plaintiff the osteoma could be removed, but might not explain her headaches. (R. 570). He also noted that she might have pseudotumor cerebri, and ordered an MRI. (R. 570). The MRI revealed hyperostosis, or sessile exostosis, or ossified

subgaleal hematoma about the outer cortex of the right frontal bone. (R. 566-567). Dr. Alzate reviewed the MRI results and assessed a metastatic spine/skull tumor, telling plaintiff that surgery might be necessary. (R. 572). On July 17, 2015, a CT scan of plaintiff's head essentially confirmed those findings. (R. 565).

Plaintiff saw Dr. Katznelson for her migraines as well. He ordered an MRV of the brain and an MRI of the head, and he prescribed Diamox, noting that if she became intolerant of medication therapy a shunt might be necessary. (R. 1343). Dr. Katznelson thought it unlikely that the osteoma was the source of plaintiff's headaches. (R. 1343). Indeed, on February 2, 2016, Dr. Katznelson noted that the MRI and MRV were basically negative. (R. 1347). Plaintiff stopped taking Diamox because of nausea, and the doctor replaced that with Lasix. (R. 1347). Dr. Katznelson diagnosed pseudotumor cerebri and idiopathic intracranial hypertension, which was likely related to plaintiff's morbid obesity. (R. 1347). Headaches continued, and intensified to the point where plaintiff sought emergency room treatment February 9, 2016 and she was given Norco for the pain. (R. 1348). Dr. Katznelson observed slight blurring of discs from pseudotumor, and thought intracranial pressure might be causing the repetitive headaches. (R. 1349). He didn't think surgery to resect plaintiff's osteoma was the answer. (R. 1349). On March 15, 2016, Dr. Katznelson noted some improvement with Lasix. (R. 593).

As just noted, plaintiff is morbidly obese, with a BMI ranging from 47.3 to 53.41. (R. 1223). The ALJ reckoned that plaintiff's weight is nearly 200 per cent above the high normal body weight, meaning it would be as if she were carrying another person on her back. (R. 109). Plaintiff has discussed bariatric surgery with her primary care physician, but the doctor felt she was not a good candidate for the surgery, due in part to her poorly controlled depression and anxiety and history of

3

noncompliance with treatments. (R. 1223-24, 1226). The risk of complications was too great, and that she would need to prove adherence for at least three to six months before the surgery would be considered. (R. 1226).

Added to that, and aggravated by it, plaintiff has lumbar spine issues. In May 2014, an MRI revealed mild central disc osteophyte at L4-5, encroaching on the central canal with mild bilateral facet arthrosis at that level. (R. 636). On November 18, 2016, at an initial physical therapy evaluation, plaintiff complained of ongoing low back pain for the past three years ( R. 977), and in March 2017, it began radiating to her leg. (R. 1242). The doctor noted that plaintiff should continue to pursue pain management and psychiatry, and that plaintiff's chronic nonspecific findings suggested a combination of chronic pain, possible fibromyalgia, depression, and anxiety, with weight-related strain. (R. 1244). In May 2017, plaintiff underwent a lumbar puncture; she was tearful at the appointment. (R. 1251-52). In July 2017, she complained of ongoing back pain at a ten out of ten, without relief from medication. (R. 1261). Examination revealed tenderness over the lumbar paraspinal region and depression. (R. 1262).

Finally, and not surprisingly given all she has to deal with, plaintiff suffers from depression and anxiety. She began treatment for depression in April of 2016, at which time she was having or depression. She reported difficulty sleeping, depressed mood, diminished interest/pleasure in things, and guilt. (R. 1325) In July 2016, plaintiff's primary care provider reported headaches and visual changes, as well of symptoms of depression and anxiety. (R. 1178). In August 2016, Citalopram was prescribed, and she was referred to a behavioral specialist. (R. 1185-1187). In September 2016, plaintiff reported worsening depression, anhedonia, and thoughts of suicide. (R. 1189-1192). Wellbutrin had not helped, so she was given prescriptions for Topamax and Adderall and advised

4

to pursue therapy. (R. 1189-1192). Worsening symptoms of depression, despite medication continued and at her session in October 2016, plaintiff was tearful, with a severely flat affect, and slowed psychomotor activity. (R. 1196-1201). Seroquel was prescribed, and she was advised that if that medication did not work, she would receive a psychiatry referral. (R. 1196-1201).

In July 2017, plaintiff's primary care physician assessed major depression, and advised her to pursue a "respite program" or an "intensive outpatient program" or an inpatient program to help manage her depression and anxiety. (R. 1263). On August 18, 2017, Plaintiff was admitted to an intensive outpatient program at Vista Medical Center, also known as partial day treatment with meetings for half the day, three days a week. (R. 1004). Plaintiff reported ongoing depression for the past five years, with symptoms of sadness, poor concentration, social isolation, inconsistent sleep, low energy, poor appetite (though she continued to gain weight), and difficulties with activities of daily living; it was "hard to even shower." (R. 1059). She also reported a contentious relationship with her sister, with a recent allegation of assault, and stated she had stopped taking all her medications. (R. 1060). She was diagnosed with major depression, severe, single episode with ongoing panic and difficulty with activities of daily living. (R. 1061). Remeron was prescribed. (R. 1061).

Two weeks later, little had changed. Plaintiff reported ongoing sadness, frustration, poor appetite, and poor sleep, as well as ongoing stress with her sister, despite prescription medication. (R. 1058). At her session, she was disheveled, frustrated, and affect was constricted. (R. 1058). She had also gained weight, and was switched to Prozac and Trazodone. (R. 1059). Four weeks into the intensive outpatient program, plaintiff reported physical exhaustion and feelings of being overwhelmed. (R. 1098). On September 18, 2017, plaintiff was assessed with major depressive

5

disorder and borderline personality disorder. (R. 1305). On September 26, 2017, after six weeks of the program, plaintiff reported to her psychiatrist that she was "going out of [her] head." (R. 1097). Her symptoms included an inability to focus, chest pain, anxiety, and difficulty calming down. (R. 1097). She displayed a full affect, and thought content that was less perseverative than previously, but mood was agitated or worried. (R. 1097). Her dosages of Prozac and Atarax were increased to help with anxiety symptoms. (R. 1097).

In October 2017, after being discharged from the program at Vista, plaintiff began treatment with psychiatrist, Marina Smirnov. (R. 1315). Plaintiff complained of ongoing low energy, anhedonia, difficulties with daily activities, and situational irritability with racing thoughts. (R. 1316). Examination revealed depressed mood, anxiety, and irritability. (R. 1322). She was diagnosed with major depressive disorder and generalized anxiety disorder, advised to continue taking Prozac and Trazodone, and was started on Buspirone. (R. 1323). She was also advised to continue with therapy. (R. 1323).

In January 2018, Dr. Smirnov found plaintiff's depression and anxiety to be worsening. (R. 1789). The doctor prescribed Pristiq, Trazodone, and Buspirone, as well as Hydroxyzine HCL. (R. 1789). In April 2018, plaintiff reported feeling overwhelmed, and she having more headaches and increased anxiety. (R. 1793). She was embarrassed by the large bump on her head, of course, and was feeling hopeless, depressed, anxious, and irritable. (R. 1793). Dr. Smirnov increased the dosage of Lexapro, and continued plaintiff on her other medications. (R. 1797). In June 2018, plaintiff's headaches were worse with the Lexapro, and Dr. Smirnov switched her to Zoloft. (R. 1801). Plaintiff said she was in considerable pain, and continued to feel depressed and anxious. (R. 1801). Her diagnoses remained the same. (R. 1804).

In October 2018, Dr. Marina Smirnov, plaintiff's treating psychiatrist, filled out a Mental Functional Capacity Questionnaire. (R. 1898-1900). At the time, she had been treating plaintiff for a year, and noted diagnoses of major depressive disorder, recurrent, moderate, and generalized anxiety disorder. She related symptoms of anhedonia, pervasive loss of interest in activities, weight changes, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. According to Dr. Smirnov, there were repeated episodes of deterioration in work-like settings which caused plaintiff to withdraw or experience symptom exacerbation. Plaintiff was on four prescription psychotropic medications, which caused side effects of drowsiness and fatigue. Dr. Smirnov felt plaintiff would have marked difficulties with understanding and remembering even simple instructions, carrying out detailed instructions, maintaining attention and concentration for two hours while performing simple tasks, performing activities within a schedule and maintaining proper attendance, sustaining work in coordination with or in proximity to others, and accepting instructions and responding appropriately to supervisors. She thought plaintiff would also have significant difficulties in interacting with coworkers or the general public and responding to workplace changes. The doctor added that plaintiff's pseudotumor cerebri contributes to her psychological symptoms and opined that plaintiff would have marked difficulty in completing a normal workday without interruption from psychologically based symptoms.

**B.**

The Social Security Administration had the plaintiff go through three administrative hearings, one every five months, throughout 2018. (R. 38-231). At each one, plaintiff was represented by counsel. At the middle session, two medical experts testified, one a neurologist and the other a clinical psychologist. And, finally, three different vocational experts testified. The ALJ determined

7

the plaintiff had the following severe impairments: morbid obesity, pseudotumor cerebri, migraines, mild degenerative joint disease of the lumbar spine, depression, anxiety and borderline personality disorder. (R. 16). The ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (R.17-19). In making this finding, the ALJ felt that plaintiff's psychological impairments resulted in a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting or maintaining pace; and a moderate limitation in adapting or managing herself. (R. 18-19).

The ALJ then determined that plaintiff could perform sedentary work, with a laundry list of additional limitations. She could only occasionally stoop, crouch, kneel, and balance; only occasionally climb ramps/stairs; never climb ladders, ropes, or scaffolds; could not work near unprotected heights, heavy equipment, operating machinery, or hazards; could not tolerate exposure to humidity or temperature extremes. She was able to understand, remember, and apply simple information; adjust to routine changes in process and priority, but needed "rote" work of limited variability that involved end-of-day performance expectations, not hourly performance expectations. She could tolerate the proximity of others, but had to avoid public interaction, frequent communication, team coordination, or more than occasional interaction with coworkers and supervisors. She could work five days a week at a consistent pace with only normal breaks, limited to being off task no more than 10% of the day and missing work on an unscheduled basis no more than 10 times annually. (R. 19).

The ALJ discussed the hearing testimony of medical expert, Dr. Goldstein, and accorded the doctor's opinion substantial weight. (R. 25). The ALJ noted that Dr. Goldstein did not find support in the record that plaintiff's pseudotumor was the cause of her headaches or that her headaches resulted in serious concentration or functional deficits. (R. 25). The ALJ said that Dr. Goldstein felt plaintiff's intracranial pressure was only mildly high, even though plaintiff's neurologist felt it was possible that intracranial pressure could be causing headaches. (R. 25). The ALJ also noted that Dr. Goldstein didn't believe plaintiff was having headaches three times a week because the record included no headache character description. (R. 25). The ALJ also observed that plaintiff had not returned for specialist care after her first go round. (R. 25). The ALJ noted that the medical expert testified that plaintiff's obesity would limit her ability to lift to sedentary work, due to risk of increased intracranial pressure. (R. 25). The ALJ essentially adopted Dr. Goldstein's opinion of plaintiff's physical limitations. (R. 25-26).

The ALJ discussed the testimony of Dr. Buitrago, the psychological medical expert, but essentially discarded it. (R. 18, 19, 26). The ALJ also discussed and considered the opinion of plaintiff's treating psychiatrist, Dr. Smirnov. The ALJ rejected her dire findings of marked limitations, noting that treatment notes reflected stable findings, normal cognition, normal thought process, and normal insight and judgment. (R. 28). The ALJ noted there had been uneven compliance with medication. (R. 28). The ALJ felt that Dr. Smirnov's opinion was consistent with the medical evidence but, somehow, also inconsistent with the entire record, including normal findings and plaintiff's daily living independence, namely the fact that she had a thirteen-year-old daughter and also cared for her sister's baby. (R.29). The ALJ also pointed out that while Dr. Smirnov reported that plaintiff would struggle with simple tasks and that her condition was worsening, she also reported that her cognition

9

was normal and her condition was stable. (R. 29). The ALJ assessed plaintiff's symptoms, comparing them with the medical evidence, but does not appear to have made a traditional credibility finding, although he clearly did not accept the extent of her allegations.

Next, the ALJ, relying on the testimony of the vocational expert who testified at the third hearing, found that, given her residual functional capacity, the plaintiff could perform a substantial number of sedentary jobs, examples being parts assembler (DOT 713.687-018; 69,00 jobs in the national economy), and inspector/sorter (DOT 669.687-018; 30,000 jobs in the national economy). (R. 31). The ALJ rejected the testimony of the first two vocational experts. (R. 32). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 40).

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

The substantial evidence standard is a low hurdle to negotiate, *Biestek*, 139 S. Ct. at 1154, but, in the Seventh Circuit, the ALJ also has an obligation to build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build a "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). The subjectivity of the requirement – one reader's Mackinac Bridge is another's rickety rope and rotting wood nightmare – can make it difficult for ALJs hoping to write acceptable decisions that stand up to judicial scrutiny when challenged.

### III.

As it happens, review of the ALJ's decision in this case, and decision to remand it to the Commissioner, turns on the "logical bridge" requirement. There are some flaws in the path of the ALJ's reasoning that do not allow a reviewing court to trace it. We begin with the array of impairments the ALJ found the plaintiff suffered from. First there is the pseudotumor that causes increased pressure to her brain. It may or may not be the source of her migraines and blurred vision. She has an actual tumor or growth as well and, although the ALJ remarked on it at one of the hearings, he didn't mention it as an impairment. Plaintiff has migraines; again, as many people with migraines are told, the course

11

is uncertain. She is so morbidly obese that, as the ALJ put it, it is as though she is carrying around an additional person. Not surprisingly, she is dealing with a lower back impairment. And, she suffers from depression, anxiety, and borderline personality disorder. Importantly, the ALJ determined that each on of these impairments, on its own, was a severe impairment, meaning that each impairment, on its own significantly limit[ed] [plaintiff's] ... ability to do basic work activities . . . ." *Bowen v. Yuckert*, 482 U.S. 137, 137 (1987); *Stage v. Colvin*, 812 F.3d 1121, 1124 (7th Cir. 2016).

When assessing if a claimant is disabled, an ALJ must account for the combined effects of the claimant's impairments, including those that are not themselves severe enough to support a disability claim. 42 U.S.C. § 423(d)(2)(B); *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018); *Browning v. Colvin*, 766 F.3d 702, 706 (7th Cir. 2014). Here, [t]he reasons given for concluding that [plaintiff] is capable of full-time gainful employment despite the administrative law judge's long list of his severe (her term) impairments are thin." *Alaura v. Colvin*, 797 F.3d 503, 506 (7th Cir. 2015). Review of the ALJ's decision leaves the impression that impairments were compartmentalized, rather than considered in combination. Sure, a person with a lower back impairment *might* be able to sit all day, but what if, as the ALJ conceded, she is sitting with another person weighing down on her spine? Morbid obesity has a likely effect even on one's ability to do sedentary work. *Browning*, 766 F.3d at 707. While the ALJ said he was accounting for plaintiff's morbid obesity in limiting her to sedentary work and no more than about two hours a day of climbing stairs/ramps, stooping, crouching, and kneeling– and that seems a stretch – he made no mention of the additional and related problem her lumbar spine impairment. (R. 25). Perhaps the ALJ was impressed by the testimony of Dr. Goldstein that this just wasn't that big of a deal. When asked why someone who weighed 300 to 350 pounds would not have trouble standing at work for an eight-hour day, Dr. Goldstein found it sufficient to say that there were people of great

weight "that do things like sumo wrestling and play in the national football league." (R. 123). The less said about that "expert" opinion the better. But it would seem to validate the long standing concern about the partisanship of some "experts."[2]

There's a similar problem with the combined effect of plaintiff's headaches and the mental impairments on her concentration and ability to focus on work for eight hours a day, five days a week. *See Endurant v. Barnard*, 374 F.3d 470, 474 (7th Cir. 2004)("Notably absent from the ALJ's order is a discussion of how [plaintiff's] headaches and blurred vision affected her ability to work."). The ALJ found plaintiff's mental impairment to result in a moderate limitation in her ability to concentrate and maintain focus on a task, and attempted to account for that with ceratin job restrictions (R. 27) – more on that later. But the ALJ did not consider the overlay of plaintiff's headaches on concentration and focus. He instead compartmentalized her headaches by finding only that these prevented her from working near unprotected heights, heavy machinery, and similar hazards. (R. 25). The ALJ's treatment of plaintiff's migraines is somewhat confusing. He found them to be a severe impairment, so he believed she was having them, but he seemed to think they affected only her vision. There's not support for that in the record, other than perhaps the testimony of Dr. Goldstein who seemed skeptical that plaintiff's headaches affected her at all because she never had one while she was at a doctor's office.[3] Ad Judge Easterbrook said in another context: "So What?...Who cares?...True, but irrelevant."

---

[2] *See* the discussion in *Tellabs Operations, Inc. v. Fujitsu Ltd.*, 283 F.R.D. 374, 385-86 (N.D.Ill. 2012). *See also* Jeffrey Cole, *The 2010 Amendments To Rule 26 And Their Far-Reaching Limitations On Discovery Of Communications Between Lawyers and Experts*, The Circuit Rider 30 (April 2011).

[3] Dr. Goldstein testified that because plaintiff had never been to the doctor while she was actually having a migraine, there is no evidence that there would be any effect on her ability to work. (R. 111-12). He said that "[p]ain, in and of itself, doesn't stop someone from working. It depends on the severity and how it affects the particular person." (R. 113). Dr. Goldstein then explained what he would consider evidence of an effect on plaintiff's ability to work:

(continued...)

*Israel Travel Advis. Serv. v. Israel Iden. Tours*, 61 F.3d 1250, 1259 (7th Cir. 1995).

So, the case must be remanded for a consideration of the *combined* effects of these impairments on plaintiff's ability to sustain full-time work. But even putting that aside, there are issues with the ALJ's accommodation of plaintiff's psychological impairments alone. The ALJ determined that, due to plaintiff's psychological impairments, she had moderate limitations on her ability to maintain concentration, persistence, and pace. (R. 27). This impairment alone resulted in a number of limitations which will be addressed a bit further on, but apparently, plaintiff's migraines, which were severe, resulted in none, as we have just discussed. Considering plaintiff's psychological impairments alone, the ALJ found plaintiff could nevertheless remember and apply simple information and was restricted to "rote work of limited variability that involves end of the day performance expectations, not hourly performance expectations." But, the impairment, although moderate, had no effect on her ability to work five days a week at a consistent pace. She would need no more breaks or time off than an unimpaired individual; in fact, she would be off task no more than 10% of the time. (R. 27). The ALJ apparently drew the "moderate restriction finding from the testimony of the medical expert, Dr.

---

[3](...continued)
like, you know, you would say close your eyes and open your hand, open your left hand or put your left hand on your right ear. They'd have difficulty doing things like that. The mental status examination would show you that they were not concentrating well.

Also, those patients normally are lying down. They can't sit up. They can't walk because the pain is so severe that they're lying there with their eyes closed lying on – on a gurney or a bed or something like that. And you can't even take a history from them. And it's – you know, you write – that's all written down on the exam. Those kind of severe migraine headaches, I would say, would make someone non-functional if they happened often enough.

(R. 114). Because Dr. Goldstein did not see any examination in the record done while plaintiff was actually experiencing a migraine, he could not say that they had any effect on her ability to work at all. (R. 116). He added that, if plaintiff really had such headaches, she would have been to the emergency room or doctor's office with one at least once. (R. 116).

Buitrago, as that's what he opined at the hearing. There's no indication where the ALJ came up with the rest.

An ALJ must incorporate a claimant's limitations, including moderate CPP limitations, when crafting the RFC and hypothetical for the VE. *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019); *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). In this Circuit, ALJs have been taken to task repeatedly for failing to adequately accommodate findings of moderate limitations on the ability to concentrate, persist, or maintain pace. A limitation to simple work does not account for problems with concentration or staying on task. *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020); *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019); *Varga*, 794 F.3d at 813. "As [the Seventh Circuit] ha[s] labored mightily to explain . . . the relative difficulty of a specific job assignment does not necessarily correlate with a claimant's ability to stay on task or perform at the speed required by a particular workplace." *Martin*, 950 F.3d at 373; *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019). "Rote work"– just another way of saying simple, routine, and repetitive – doesn't do it either. *Lea A. T. v. Comm'r of Soc. Security*, 2020 WL 5038604, at *7 (S.D. Ill. 2020); *Jelinek v. Saul*, 2020 WL 4679632, at *6 (N.D. Ind. 2020). Here, the ALJ's mental RFC was, essentially, no different that the one the Seventh Circuit rejected in the ALJ limited *Mischler v. Berryhill*, 766 F. App'x 369, 375–76 (7th Cir. 2019)((1) "simple routine and repetitive tasks" in a low-stress job, defined as one involving only occasional (2) decision-making, (3) changes in the work setting, (4) and interaction with the public or co-workers; (5) "no piecework or fast moving assembly line type work;" and (6) the flexibility to be off-task up to ten percent of the day."). As such, the ALJ failed to account for the "moderate" difficulties in concentration, persistence, and pace. *Id.*

The deficiency is further highlighted by the ALJ's finding that, despite a moderate limitation on her concentration, persistence and pace, plaintiff would be off task no more than 10% of the day, and her limitations could be accommodated by normal break time. There is no indication where the ALJ came up with the 10% number. The ALJ had to build a "logical bridge" to get to that number, and he didn't. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017)(remand where ALJ did not link 'the 'no more than 10%' finding and the psychologists' general assessment that Lanigan exhibits moderate difficulty in areas like the 'ability to maintain attention and concentration for extended periods' and the 'ability to perform activities within a schedule.'"). Even if he had, the finding seems to make little sense. The regulations instruct ALJs to rate the degree of limitation on a 5-point scale of none, mild, moderate, marked, and extreme. See 20 C.F.R. § 404.1520a. *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698–99 (7th Cir. 2016). If the unimpaired worker is off task no more than 10% of the time, if that's the industry standard (R. 46), then wouldn't that number rise at the mildly and moderately impaired levels? In essence, the ALJ said that someone with a moderate restriction on concentrating and maintaining pace due the psychological issues needed no more accommodation than a person with no limitation at all. *See Jelinek*, 2020 WL 4679632, at *6; *Warren v. Colvin*, 2013 WL 1196603, at *3 (N.D. Ill. 2013). Obviously, the required logical bridge is lacking there.

The ALJ's reference to an end of the day production quota, rather than an ongoing quota throughout the day, is another accommodation that has been criticized by the Seventh Circuit. "[T]here is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace." *DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019); *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016). On the other hand, the court has accepted a restriction to work that allowed flexibility and

16

requirements that were goal oriented. *See Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020). In *Martin*, that resulted in the vocational expert giving job examples of cleaner or warehouse worker. That makes sense; one must accomplish set tasks, but the pace at which one does is essentially his own. Here, however, the ALJ's "production quota" language resulted in job examples of parts assembler DOT 713.687-018 (69,000 nationally) and inspector/sorter DOT 669.687-018 [sic] (30,000 nationally). (R. 31).

According to the Dictionary of Occupational titles, a parts assembler "[a]ttaches nose pads and temple pieces to optical frames, using handtools: Positions parts in fixture to align screw holes. Inserts and tightens screws, using screwdriver." https://occupationalinfo.org/71/713687018.html. This is close work, requiring focus and concentration and the ability to quickly and repeatedly make precise adjustments. https://occupationalinfo.org/onet/93956.html#SKILLS. Inspector/sorter "[i]nspects dowel pins for flaws, such as square ends, knots, or splits, and discards defective dowels." https://occupationalinfo.org/66/669687014.html. Again, that's work that requires focus and concentration. https://occupationalinfo.org/onet/83005a.html. It's not self-evident that someone with moderate level concentration limitations could do such work on a consistent, full-time basis, and that's before migraines are added to the analysis. Moreover, even if one accepts the ALJ's take that plaintiff's headaches only affect her vision, "one wonders how someone with . . . episodes of blurred vision could perform the jobs suggested by the VE, . . . which would require attention to visual detail." *Endurant*, 374 F.3d at 474. Notably, when talking with the vocational expert, the ALJ mentioned his restriction regarding heights and hazards, but didn't mention the source of it – migraines and blurring vision – to the vocational expert. (R. 44).

So, the vocational expert came up with jobs that seem ill-suited to a person like the plaintiff. And, the vocational expert said those were the *only* jobs a person like the plaintiff could do. His list was "exhaustive." (R. 46). In other words, even without a proper assessment of the combined effect of plaintiff's impairments and a proper accounting for moderate concentration, persistence, and pace difficulties, the only things plaintiff could do were putting the little screws in eyeglasses and inspecting dowel rods.

Beyond that, this case presents the usual questions about job numbers. *See, e.g., Forsythe v. Colvin*, 813 F.3d 677, 680–81 (7th Cir. 2016); *Herrmann v. Colvin*, 772 F.3d 1110, 1112–14 (7th Cir.2014); *Browning v. Colvin*, 766 F.3d 702, 708–09 (7th Cir.2014). It looks as though the vocational expert arrived at his figures by doing the type of arithmetic the Seventh Circuit has criticized in the past. (R. 47-50); *see Forsythe v. Colvin*, 813 F.3d 677, 680–81 (7th Cir. 2016); *Alaura v. Colvin*, 797 F.3d 503, 507–08 (7th Cir. 2015); *Hill v. Colvin*, 807 F.3d 862, 870 (7th Cir. 2015)(Posner, J., concurring). The two jobs the vocational expert came up with were last seen over 40 years ago, in 1977. But as the foregoing issues each require a remand on their own, we shall not delve into it. We mention it only as being one more problem in addition to the others.

As such, the review of this case, in a way, presents a consideration of combined problems, not unlike combined impairments. One must not focus on the trees and ignore the forest. The plaintiff has a pseudo brain tumor and a visible tumor. She has migraines which may or may not come from the pseudotumor. She weighs at least twice as much as an ordinary person her height and has a lower back impairment. She is depressed and anxious and lethargic. She has been prescribed a pharmacy's worth of medications and, while she goes off them from time to time, they cause her predictable side effects. The doctor at one of her hearings thought she could be a sumo wrestler and was dismissive of her

migraines because she never had one right in front of a doctor. The vocational expert said there were only two jobs she could possibly do, and they don't exactly seem common or even possible for her. There are cases, and we are not going to say this is one, where the combined effect of the record and the testimony and the ALJ's Opinion leave one with the happily rare impression that the Commissioner might have been trying a bit too hard to find the plaintiff not disabled. Still, "[i]t remains true that an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Allord v. Astrue*, 631 F.3d 411, 417 (7th Cir. 2011). As the remand here comes under the Seventh Circuit's "logical bridge" requirement, an award of benefits is not appropriate without further administrative proceedings.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment [Dkt. #12] is granted insofar as this case is remanded to the Commissioner.

**ENTERED:** _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 11/2/20